MARK PROPERTIES, INC., A NEVADA CORPORATION, APPELLANT, *v.* NATIONAL TITLE CO., A NEVADA CORPORATION; AND LAWYERS' TITLE OF NEVADA, INC., A NEVADA CORPORATION, RESPONDENTS.

No. 32954

November 26, 2001                                34 P.3d 587

*Hutchison & Steffen* and *Michael K. Wall,* Las Vegas, for Appellant.

*Hale Lane Peek Dennison Howard & Anderson* and *James M. Walsh* and *Robert C. Vohl,* Reno, for Respondents.

Before Young and Rose, JJ.

## OPINION ON REHEARING

By the Court, Rose, J.:

On December 14, 2000, we issued an opinion affirming in part and reversing in part the district court's summary judgment, and remanding this case to the district court.[1] Subsequently, respondent National Title Company filed a petition for rehearing, to which Mark Properties, Inc., responded. We have reviewed the parties' submissions, as well as the briefs and appendix, and we conclude that rehearing is warranted. Additionally, our prior opinion must be withdrawn. We now issue this opinion in place of our prior opinion.

At issue in this appeal is whether an escrow agent has a duty beyond that set forth in the escrow instructions to apprise a party to the escrow, and an alleged principal who is not a party to the escrow, of fraud in a "double escrow" transaction. We conclude that an escrow agent must inform a party to the escrow that fraud has been committed if the facts actually known to the escrow agent present substantial evidence of fraud.

### FACTS

In early 1995, Mark Snop and Mark Raiter, real estate investors from Israel, were introduced to Sam Ventura, an individual described as a successful real estate developer in Las Vegas, Nevada. Snop and Raiter later telephoned Ventura, inquiring about real estate development in the Las Vegas market. Ventura sent Snop and Raiter a letter soliciting their investment, and provided Snop and Raiter with a 1994 appraisal of a forty-acre parcel located in North Las Vegas that was available for acquisition and development.

---

[1]*Mark Properties v. National Title Co.,* 116 Nev. 1158, 14 P.3d 507 (2000).

Snop and Raiter informed Ventura that they would be willing to consider a joint venture in which Snop, Raiter, and Ventura would each contribute cash to develop the forty-acre parcel. Ventura, Snop, Raiter, and Ventura's associate, Michael Bash, agreed that Snop and Raiter would form a corporation, Mark Properties, Inc., that would provide sixty percent of the cash required for the forty-acre parcel, and Ventura and Bash, through Terra Vegas Corporation, an entity they controlled, would provide forty percent. Everyone further agreed that despite Terra Vegas' contribution of only forty percent of the down payment, Terra Vegas would receive a full fifty percent ownership interest in the parcel in return for locating the property and representing the partnership in Las Vegas.

In June 1995, Terra Vegas sent Mark Properties a proposed joint venture agreement, escrow instructions, and an installment note for the forty-acre parcel. The purchase price of the parcel was $2,400,000, with the parties providing $1,475,000 in cash and a note for the remainder. In order to close escrow, Mark Properties was to deposit $885,000 in cash and Terra Vegas was to deposit $590,000. Mark Properties gave its cash deposit to the escrow handler, National Title Company.

On the day escrow was to close, Snop and Raiter allegedly discovered that the seller of the forty-acre parcel was not an unrelated third party, as Ventura and Bash had represented, but instead was Rowe Land, a corporation controlled by Bash. When Snop and Raiter confronted Ventura and Bash about Rowe Land being the seller, Ventura explained that Rowe Land had purchased the parcel from the original seller merely to facilitate its acquisition by Mark Properties and Terra Vegas, and that there was no difference between the price Rowe Land had paid for the land and the price of the sale to Mark Properties and Terra Vegas. Relying on this information, Mark Properties concluded the transaction by releasing its $885,000 cash deposit to Rowe Land.

Mark Properties purportedly realized later that by establishing a double escrow, Rowe Land had purchased the parcel for a lower price, and then used the down payment tendered by Mark Properties to satisfy Rowe Land's down payment obligation to the original owner. According to Mark Properties, as a result of this double escrow, Bash—and ultimately Terra Vegas—fraudulently profited, with Bash violating his fiduciary duty to Mark Properties. Mark Properties insists that at the time of the transaction, it did not know Bash was profiting from the double escrow.

Mark Properties also asserts that National Title knew the details of the double escrow. But the facts concerning who knew what, and when any knowledge of the details of the double escrow was acquired, are unclear and highly contested. For instance, regard-

ing the knowledge of both National Title and Mark Properties, Nancy Wilder, a National Title escrow agent, testified at deposition that (1) she was aware the land was being sold through a "double escrow" and there was a price difference between the two transactions; (2) Snop, Raiter, and their attorney were also aware of the double escrow and the price difference because she had overheard them discussing it at the escrow closing; and (3) Snop and Raiter had no problem with the double escrow and decided to proceed with the transaction. But Wilder also conceded that she could not understand much of the discussions she overheard because Snop and Raiter were speaking Hebrew or Russian; that "there's a lot of things in the conversation [she] probably missed" because she often does other work "during these kind of meetings"; and that she could not remember whether "the subject of profit to either Mr. Bash or Mr. Ventura . . . was ever discussed."

Before Snop and Raiter discovered this alleged fraud, other real property transactions were consummated. Terra Vegas and Mark Properties formed Ann-Allen, L.L.C., a limited liability company created for the acquisition and development of real property. In September 1995, Ann-Allen acquired for $700,000 a twenty-acre parcel that was attached to the forty-acre parcel originally purchased by Mark Properties and Terra Vegas.

Furthering the purchase of the twenty-acre parcel, the parties opened another escrow account at National Title. This transaction required a down payment of $400,000—$240,000 in cash from Mark Properties and $160,000 in cash from Terra Vegas. Mark Properties and Terra Vegas each had a fifty-percent ownership interest in the twenty-acre parcel, but Ann-Allen held title to the parcel. Again, Ventura and Bash had arranged a double escrow, as Rowe Land had contemporaneously entered into an escrow at Old Republic Title to purchase the property for a lower price. Snop and Raiter contend that they were unaware Rowe Land had purchased this land for a lower price, as they were told by Bash that Rowe Land had only purchased the land to facilitate the sale to Ann-Allen.

Next, in early 1996, Mark Properties and Bash agreed to form Moscow Strip Development Corporation to buy the Sunbird Inn Motel. Bash told Mark Properties that the sale price of the Sunbird Inn was $4,000,000, and that a deposit of $75,000 was required to open the escrow, of which Mark Properties was to contribute $50,000 and Bash was to contribute $25,000. As with the two prior transactions, Bash's company, Rowe Land, had contemporaneously entered into an agreement to purchase the Sunbird Inn for a lower price from a third party, Robert and Georgina Chapman.

After Rowe Land had deposited $50,000 into escrow at Lawyers' Title, the transaction fell through because Bash failed to obtain the proper licenses. Thereafter, Mark Properties learned Bash was profiting from the double escrows.

Raiter met with a Lawyers' Title escrow agent and requested that she hold the $50,000 pending Mark Properties' litigation against Ventura and Bash. Despite this request, the escrow agent refunded $38,000 to Rowe Land and $12,000 to the Chapmans.

Mark Properties filed a complaint against Lawyers' Title and National Title, alleging negligence and breach of fiduciary duty. In response, National Title filed a motion for summary judgment, arguing that it had no duty to disclose or investigate fraud as a matter of law. Lawyers' Title also filed a motion for summary judgment, arguing that it owed no duty to Mark Properties with respect to the Rowe Land/Chapman escrow because Mark Properties was not a party to the escrow. The district court agreed with National Title and Lawyers' Title, and granted both motions for summary judgment. Mark Properties appealed.

## DISCUSSION

We review de novo the district court's entry of summary judgment.[2] Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[3] In determining whether summary judgment is warranted, the nonmoving party is entitled to have the evidence and all reasonable inferences accepted as true.[4]

Mark Properties contends the district court erred in ruling that National Title and Lawyers' Title had no legal duty to disclose fraudulent circumstances of which they were aware. We agree with Mark Properties that an escrow agent has a duty to disclose fraud committed by another party to the escrow "if the facts actually known to the escrow agent present substantial evidence of fraud."[5] Although we conclude that the escrow agent has such a duty, we also conclude that an escrow agent has no duty to investigate circumstances surrounding a particular sale in order to discover fraud.[6]

---

[2]*Ortega v. Reyna,* 114 Nev. 55, 58, 953 P.2d 18, 20 (1998).

[3]NRCP 56(c); *see also Lester v. Buchanen,* 112 Nev. 1426, 1428, 929 P.2d 910, 912 (1996).

[4]*Ferreira v. P.C.H. Inc.,* 105 Nev. 305, 306, 774 P.2d 1041, 1042 (1989).

[5]*Burkons v. Ticor Title Ins. Co. of California,* 813 P.2d 710, 720 (Ariz. 1991).

[6]*Berry v. McLeod,* 604 P.2d 610, 616 (Ariz. 1979) ("[A]n escrow agent has no duty to look for fraud.").

Generally, the escrow instructions control the parties' rights and define the escrow agent's duties.[7] Other jurisdictions have, however, recognized an exception to this general rule, holding that an escrow agent has a duty to disclose fraud to the parties with whom it has an escrow relationship.[8] For instance, Arizona imposes a limited duty to disclose:

> [An escrow agent may not] close its eyes in the face of known facts and console itself with the thought that no one has yet confessed fraud. Although not required to investigate, when the agent is aware of facts and circumstances that a reasonable escrow agent would perceive as evidence of fraud, then there is a duty to disclose.[9]

We adopt this characterization of an escrow agent's duty. We cannot condone an escrow agent's silence when the agent is aware of facts indicating that fraud is being perpetrated on a party with whom the agent has an escrow relationship. When the escrow agent performs the escrow with such an awareness, the agent becomes, in effect, a participant in the fraud, and should, therefore, be liable to the defrauded party if the fraud is not disclosed.[10]

We acknowledge that other jurisdictions, such as California, hold that an escrow agent has no duty beyond that contained in the escrow instructions.[11] California courts have refused to extend an escrow agent's duty beyond the escrow instructions on the basis that an escrow agent has only a limited agency relationship with the parties to the escrow.[12] The rationale behind refusing to impose a disclosure duty is that such a duty would subject the escrow agent to a high risk of litigation, thereby discouraging reasonable persons from acting as escrow agents.[13] We simply disagree.

---

[7]See Broussard v. Hill, 100 Nev. 325, 682 P.2d 1376 (1984).

[8]E.g., Powell v. H.E.F. Partnership, 793 F. Supp. 91, 93 (D. Vt. 1992); Burkons, 813 P.2d at 716-18; American State Bank v. Adkins, 458 N.W.2d 807, 810 (S.D. 1990).

[9]Burkons, 813 P.2d at 718 (internal quotation marks and citation omitted).

[10]3 Harry D. Miller, California Real Estate § 6:26 (3d ed. 2000).

[11]E.g., Lee v. Title Ins. Co., 70 Cal. Rptr. 378 (Ct. App. 1968); Blackburn v. McCoy, 37 P.2d 153 (Cal. Ct. App. 1934); accord Gurley v. Bank of Huntsville, 349 So. 2d 43, 45 (Ala. 1977).

[12]Lee, 70 Cal. Rptr. at 380-81; Blackburn, 37 P.2d at 155 (holding that the escrow relationship cannot be one of general agency because the parties to a real property transaction have conflicting interests).

[13]Lee, 70 Cal. Rptr. at 380.

Having concluded that an escrow agent has a limited duty to disclose, we must reverse the district court's summary judgment on Mark Properties' action against National Title. There is a triable, albeit highly contested, issue of material fact regarding whether Wilder breached her duty to disclose to Mark Properties fraud of which she was aware concerning the escrows of the forty and twenty-acre parcels.[14] It is clear from Wilder's testimony that she knew of the double escrows and the price differentials. But whether she learned of these facts by overhearing Snop and Raiter discuss them with their attorney, or discovered the facts previously through some other source, is in dispute. We leave the resolution of these questions to the trier of fact.

With respect to Mark Properties' causes of action against Lawyers' Title, we affirm the district court's summary judgment. An escrow agent owes a duty to disclose fraud only to parties to the escrow transaction.[15] It is undisputed that Mark Properties was not a party to the Lawyers' Title escrow agreement. Mark Properties suggests that Lawyers' Title should have held the Rowe Land/Chapman funds pending a court's resolution of Mark Properties' litigation against Ventura and Bash because it (Mark Properties) was a principal to the transaction. But there is neither compelling rationale nor any authority for such a suggestion. In fact, if Lawyers' Title were to release funds upon a third party's request and in violation of the escrow instructions, it would likely be liable to the parties to the escrow for breach of fiduciary duty and conversion.[16] Accordingly, we conclude that Lawyers' Title owed no duty to Mark Properties because Mark Properties was not a party to the Lawyers' Title escrow.

## CONCLUSION

The district court erred in granting National Title's motion for summary judgment. There is a triable issue of material fact concerning whether National Title breached a duty owed to Mark

---

[14]Although Ann-Allen took title to the twenty-acre parcel, it was undisputed below that Mark Properties was a party to that escrow transaction.

[15]See Berry, 604 P.2d at 616.

[16]See Broussard v. Hill, 100 Nev. 325, 329, 682 P.2d 1376, 1378 (1984) ("The escrow agent must strictly comply with the terms of the escrow agreement and may not use the proceeds in any manner that is not authorized by contract or deposit."); see also Kula v. Karat, Inc., 91 Nev. 100, 103-04, 531 P.2d 1353, 1355 (1975) ("There is authority for the broad rule that as long as the [bailor-bailee] relationship exists a bailee may not, in any case, dispute or deny the title of the bailor, or his ultimate right to possession . . . by asserting title in a third person.").

Properties to disclose fraud of which it was aware. We also conclude that Lawyers' Title owed Mark Properties no duty because Mark Properties was not a party to the Lawyers' Title escrow transaction, and thus, the district court did not err in granting Lawyers' Title's motion for summary judgment. Consequently, we affirm the district court's summary judgment as to Lawyers' Title, we reverse the district court's summary judgment as to National Title, and we remand for further proceedings consistent with this opinion.[17]

YOUNG, J., concurs.

---

[17]THE HONORABLE A. WILLIAM MAUPIN, Chief Justice, voluntarily recused himself from participation in the rehearing of this matter.