LEM 2Q, LLC v. Guaranaty National Title Co.

*Paul R. Rosen, Bruce L. Thall and Neal R. Troum,* for plaintiffs.

*Robert H. Dickman, Suzanne McDonough and Scott C. Gottel,* for defendants.

MCINERNEY, *J.,* Nov. 6, 2014—Six[1] motions for summary judgment require this court to determine whether escrow agents in a loan/investment transaction involving real estate, had a duty to disclose to lenders/ investors the existence of prior unrecorded encumbrances

---

1. In reality, there are only five motions for summary judgment before the Bench. Motion control no. 14060967, improperly filed by defendant Joseph P. Cacciatore as a motion for summary judgment, is actually a response in opposition to the motion for summary judgment of plaintiffs, control no. 14050901. This improper filing is counted as a motion for summary judgment for docketing purposes only. Moreover, defendants Guaranty National Tile Company, Robert J. Voegel and Robert Rothstein improperly filed their response in opposition to the motion for summary judgment of plaintiffs under control no. 14050848. This response should have been properly filed under control no. 14050901.

upon the realty. For the reasons below, this court finds that the escrow agents had no duty to disclose the existence of prior unrecorded encumbrances upon the realty.

## Background

Plaintiffs are successors-in-interest of an entity that invested $3 million in real property under a preferred equity scheme. Defendant Fidelity National Title Insurance Company ("Fidelity"), is an Illinois title insurance company registered to conduct business in Pennsylvania. Defendant Guaranty National Title Company ("Guaranty"), is an Illinois entity. At all times relevant to this action, Guaranty was title assurance agent on behalf of Fidelity, pursuant to an Issuing Agent Agreement (the "IAA") executed before the occurrence of any of the facts relevant to this action. Individual defendant Robert J. Voegel ("Voegel"), a resident of Illinois, executed the IAA on behalf of Guaranty in his role as president and counsel thereof. Individual defendant Robert R. Rothstein, Esquire ("Rothstein"), was or is Senior Vice President of Guaranty. Individual defendant Joseph P. Cacciatore ("Cacciatore"), is an Illinois resident. Voegel and Cacciatore are or were members of an entity known as C&V Investments, LLC ("C&V"), a non-party in the instant action. Whenever necessary, Guaranty, Voegel, Rothstein and Cacciatore will be indentified herein as the "Guaranty defendants."

On May 1, 1999, Fidelity and Guaranty entered into the IAA, whereby Fidelity appointed Guaranty as its agent for real estate title assurance. The IAA remained in effect at all times relevant to his action. Pursuant to the IAA, Fidelity specifically appointed Guaranty—

to countersign and issue title insurance commitments, guarantees, endorsements, title insurance policies of [Fidelity], or any other form whereby [Fidelity] assumes liability (collectively, Title Assurances) in

[Guaranty's] territory set forth in Schedule A.[2]

In the Spring of 2007, individual defendants Voegel and Cacciatore, through C&V, loaned funds to a real estate investor, Russell M. Meusy, II ("Meusy"), and his company (collectively, the "Meusy Interests"), to facilitate Meusy's purchase of a 234 multi-family property (the "property"), located in Reno, Nevada.[3] The loan transactions occurred in Illinois; none of the loans was recorded with any public agency. Subsequently, closing on the property occurred on May 11, 2007, with defendant Guaranty performing the duties of settlement agent.[4] The closing papers prepared by Guaranty did not disclose that C&V had loaned funds to the Meusy Interests.

After closing on the property, the Meusy Interests approached plaintiffs' predecessors in interest to obtain additional funding. Plaintiffs' predecessors reviewed the settlement papers prepared by Guaranty at the property closing of May 11, 2007, and decided to provide funding to the Meusy Interests. Thus, on June 29, 2007, plaintiffs predecessors invested $3 million in a company known as Manzanita Gate Apartment Holdings, LLC ("Manzanita Holdings"), an entity formed by Meusy to act as the direct or indirect owner of the property. Plaintiffs' $3 million investment in Manzanita Holdings was made through a financial device known in the real estate investment business as a "mezzanine loan." The purpose of the mezzanine loan was to provide the Meusy Interests with capital, and to allow plaintiffs' predecessors to acquire a preferred equity stake in Manzanita Holdings. Defendant Guaranty performed the duties of escrow agent and closing

---

2. Issuing agency agreement, Exhibit A to the motion for summary judgment of plaintiffs, control no.14050848.

3. Exhibits A through E to the amended complaint.

4. Statement of settlement for purchasers, Exhibit Q to the motion for summary judgment of plaintiffs, control no. 14050484.

officer to the $3 million mezzanine loan.[5] During this closing, Guaranty did not disclose the existence of C&V's prior unrecorded loans to the Meusy Interests. Shortly thereafter, the Meusy Interests defaulted on all of their obligations, including the C&V loans and the mezzanine loan provided by plaintiffs' predecessors in interest.

Plaintiffs commenced the instant action in July 2007. After a long and convoluted procedural history, which included the filing of an amended complaint in January of 2011, plaintiffs filed a motion for summary judgment against Guaranty, Voegel, Rothstein and Cacciatore.[6] This motion essentially asserts that Guaranty, as the escrow agent to the mezzanine loan, had a duty to disclose to plaintiffs' predecessors the existence of C&V's "usurious" loans.[7] According to this motion, if plaintiffs' predecessors had been informed of the existence of such usurious loans, they would have concluded that any investment in Manzanita Holdings would have been risky; consequently, plaintiffs' predecessors would have refrained from funding Manzanita Holdings, and would not have lost their $3 million investment.[8]

Plaintiffs also filed a motion for summary judgment against Fidelity, as principal of Guaranty.[9] According to this motion, Fidelity is liable for the losses suffered by plaintiffs, under a theory of *respondeat superior*, pursuant to the terms of the IAA which Fidelity and Guaranty

5. Exhibit I to the motion for summary judgment of defendants guaranty, Voegel and Rothstein, control no. 1407030.

6. Motion for summary judgment of plaintiffs, control no. 14050901.

7. *Id.*, ¶ 71. *See also* memorandum of law in support of motion for summary judgment no. 14050901 at II.

8. Motion for summary judgment of plaintiffs, control no. 14050901, ¶¶28-31.

9. Motion for summary judgment of plaintiffs, control no. 14050848.

executed in 1999.[10] On July 21, 2014, defendants Guaranty, Voegel and Rothstein filed a cross-motion for summary judgment against plaintiffs.[11] On the same day, defendants Fidelity and Cacciatore filed their respective cross-motions for summary judgment.[12] All the motions have been fully briefed and are ripe for a decision.

## Discussion

### I. Choice-of-law analysis.

The action presents facts requiring this court to determine whether the substantive laws of Nevada, Illinois or Pennsylvania apply to the resolution of the motions for summary judgment.

In Pennsylvania,

> choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary.

> However, if the court determines that a conflict of laws exists, then the court must analyze the governmental interests underlying the issue to identify the state with the greater interest in the application of its laws.[13]

> In resolving conflict-of-law issues...Pennsylvania follows the flexible conflicts methodology. Under this methodology, the court must apply the law of the state with the most significant contacts or relationships with the particular issue. In applying this process, the court does not simply count the parties' contacts with the competing states; rather, it identifies the jurisdiction

---

10. Memorandum of law in support of plaintiffs motion for summary judgment, at II-C, control no. 14050848.

11. Control no. 14073030

12. Control no. 14073024, 14073032.

13. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa. Super. 2000).

with the greater interest by measuring the quality of each contact[14]

However, the court will not engage in a choice-of-law analysis indiscriminately; instead, the court will proceed with this analysis only in the presence of conflicts of substantive law-namely, in the presence of laws which fix the parties' rights and duties to a judicial proceeding, as opposed to procedural laws which lay down how the parties may have their rights enforced, and their duties imposed, in a judicial proceeding.[15]

Plaintiffs contend that the law of Nevada should apply to determine whether Guaranty, as escrow agent to the Closing Escrow Agreement, owed a duty to disclose to Plaintiffs the existence of prior unrecorded loans encumbering the property,[16] Review of the pertinent law in Nevada shows that plaintiffs have misinterpreted the laws of that state. Generally, under Nevada law, "the escrow instructions control the parties' rights and define the escrow agent's duties."[17] Moreover, "an escrow agent must strictly comply with the terms of the escrow agreement."[18]

Nevertheless, plaintiffs rely on a Nevada case for the proposition that an escrow agent, such as Guaranty, owed them a duty to disclose the existence of any unrecorded encumbrances upon the property. In support of this

---

14. *Pyrites Co. v. Century Indem. Co.*, 4514 Jan. Term 2003, 2007 WL 5160528 (Pa. Com. Pl. Dec. 12, 2007) (citing *Caputo v. Allstate Insurance Co.*, 4958 A.2d 959, 961 (Pa. Super. 1985), *Wilson v. Transportation Insurance Co.*, 889 A.2d 563, 571 (Pa. Super. 2005)).

15. *Wilson. Transportation Insurance Co.*, 889 A.2d 571 (Pa. Super. 2005).

16. Memorandum of law in support of motion for summary judgment of plaintiffs at II-A, control no. 14050901.

17. *Harris v. Equity Title Co, LLC*, No. 52197, 2010 WL 3295591, at *2 (Nev. July 20, 2010).

18. *Id.*

argument, plaintiffs cite *Mark Properties, Inc. v. National Title Co.*[19] The facts in *Mark Properties* are readily distinguishable from those involved herein, and do not apply to the resolution of the issue at hand.

In *Mark Properties*, two Israeli businessmen, Snop and Raiter, wished to develop land in Nevada. They contacted two local businessmen, Ventura and Bash, to inquire about real estate development opportunities in the Las Vegas market. Ventura informed Snop and Raiter that a third-party owner was willing to sell a forty-acre parcel of land at a specific price. Snop, Raiter, Ventura and Bash determined that the selling price was agreeable and decided to structure the acquisition as follows: Snop and Raiter would form a corporation, Mark Properties, Inc., which would provide sixty percent of the money required to buy the forty-acre parcel; Ventura and Bash, on the other hand, would provide the remaining forty percent of the needed capital through an entity under their control, Terra Vegas Corporation.[20]

Unknown to the two Israelis, Bash acquired the parcel from its owner at a price below the figure agreed-upon by Snop and Raiter. At closing, the Escrow Agent, National Title Company ("National Title"), performed a double escrow.[21] Through this device, National Title received

---

19. *Mark Properties. Inc. v. National Title Co.*, 117 Nev. 941; 34 P.3d 587 (Nev. 2001).

20. *Mark Properties. Inc. v. National Title Co.*, 117 Nev. at 942-943; 34 P.3d at 588-589 (Nev. 2001).

21. Nevada courts have described a double escrow as follows: "[i] n a double escrow, the broker or salesman purchases a principal's property in the first escrow, and sells it to a third party at a profit in a second escrow without a full disclosure to both the principal and the third party. The escrows close at the same time and the broker or salesman thereby uses the proceeds from the sale in the second escrow to purchase his principal's property. The broker or salesman receives a commission on the sale in the first escrow and a secret profit on the closing in the second escrow." *Alley v. Nevada Real Estate Div.*, 94 Nev. 123, 124-25, 575 P.2d 1334, 1335 (1978).

in escrow the full amount agreed upon by Snop, Raiter, Ventura and Bash. Upon receipt of this escrowed amount, National Title closed first on Bash's acquisition by using the funds of Mark Properties, Inc. to satisfy the third-party seller. Simultaneously, National Title closed on the second transaction by which Bash transferred the parcel to Snop and Raiter for the full, original price. In other words, Bash, and presumably Ventura, pocketed the difference between the lower price paid by Bash, and the higher price ultimately paid by Snop and Raiter, while using the funds of Mark Properties, Inc. without the knowledge or consent of Snop or Raiter. All along, National Title, as the escrow agent, knew that Ventura and Bash, through their self-dealing, had breached their fiduciary duties to business partners Snop and Raiter.[22]

Snop and Raiter, through Mark Properties, Inc., filed an action against National Title as the escrow agent of the double escrow transaction. The complaint alleged that National Title breached its duty by failing to disclose the fraud perpetrated against Mark Properties, Inc. and its owners by business partners, Ventura and Bash. National Title filed a motion for summary judgment, and a district county court in Nevada granted the motion. Snop and Raiter, through Mark Properties, Inc., appealed the lower court's decision. Reversing, the Nevada Supreme Court held that "generally, the escrow instructions control the parties' rights and define the escrow agent's duties."[23] However, the Nevada Supreme Court also explained that "an escrow agent has a duty to disclose fraud committed by another party to the escrow if the facts actually known to the escrow agent present substantial evidence

---

22. *Mark Properties, Inc. v. National Title Co.*, 117 Nev. at 943-944; 34 P.3d at 589-590 (Nev. 2001).
23. *Mark Properties. Inc. v. National Title Co.*, 117 Nev. at 943-944; 34 P.3d at 589-590 (Nev. 2001).

of fraud."[24] The facts in *Mark Properties* are clearly distinguishable from those involved in this case. In *Mark Properties*, the fraud of self-dealing, known to the escrow agent, was committed by two businessmen, Ventura and Bash, against their own business partners, Snop and Raiter, despite the existence of a fiduciary duty binding together the four business partners. This breach presented "substantial evidence" of fraud such as to create a duty to disclose the known fraud. Whereas, in this case, Guaranty was involved in two separate and distinct closings: in the first, Guaranty acted as settlement and escrow agent to the sale of the property from sellers to the Meusy Interest; in the second closing, which took place nearly two months after the first, Guaranty was acting merely as an escrow agent to a transaction between the Meusy Interests and plaintiffs. This transaction involved a mezzanine loan-a financial device designed to allow plaintiffs to acquire not a direct stake in the property, but an equity interest in an entity controlling the Property directly or indirectly. The duties of Guaranty in the second closing were purely administrative because they required only holding the escrowed funds and disbursing them at closing. In short, unlike the escrow agent's duties triggered in *Mark Properties*, Guaranty's duties under the Closing Escrow Agreement did not present the "substantial evidence of fraud," and did not require Guaranty to disclose the existence of prior unrecorded encumbrances upon the property. This court finds that the law articulated in *Mark Properties* is inapposite to the facts in this case; in addition, the court finds that the law of Nevada, which "generally" limits the duties of an escrow agent to any instructions contained in the escrow agreement, do not differ from the law of Pennsylvania on the same issue. Finally, the court

---

24. *Mark Properties, Inc. v. National Title Co.*, 117 Nev. at 945; 34 P.3d at 590 (Nev. 2001).

finds that the laws of Nevada, Illinois and Pennsylvania as to each claim asserted in plaintiffs' amended complaint, do not differ from each other. For this reason, the court will rely on Pennsylvania law to resolve each issue presented by the motions for summary judgment.

II. The Guaranty Defendants had no duty to disclose the existence of prior loans to Plaintiffs' predecessors.

Plaintiffs' case hinges on the proposition that Guaranty, as the escrow agent to the mezzanine loan transaction, owed a duty to disclose to plaintiffs' predecessors the existence of prior unrecorded encumbrances upon the property. In Pennsylvania,

> [t]he escrow agent or depositary is generally considered the agent of both parties under a special agency agreement, where authority of the agent is strictly construed and whose responsibilities are set forth in the escrow agreement.[25]

Here, the Closing Escrow Agreement for the mezzanine loan states that the duties of the Escrow Agent are purely "ministerial in nature" and "no additional obligations of Escrow Agent [should] be implied from the terms of this agreement."[26] The Escrow Agreement further states that the "Escrow Agent shall incur no liability in connection with the discharge of its obligations under the agreement

---

25. *Knoll v. Butler*, 675 A.2d 1308, 1312 (Pa. Commw. 1996) *aff'd*, 548 Pa, 18, 693 A.2d 198 (1997). Paragraph 10 of the Closing Escrow Agreement states that "[t]his agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of Nevada." However, the real issue in this instance does not involve a dispute arising out of the interpretation of the Closing Escrow Agreement; rather, the issue in this case is whether the guaranty defendants owed a duty to disclose to plaintiffs the existence of prior unrecorded encumbrances. There is no need to rely on the laws of Nevada, and Pennsylvania law suffices to resolve the issue.

26. Closing Escrow Agreement, Exhibit I to the motion for summary judgment of guaranty, ¶ 11.

or otherwise in connection therewith, except such liability as may arise from the willful misconduct or gross negligence of Escrow Agent."[27] Finally, review of the entire document leaves no doubt: nothing in the Escrow Agreement required the Guaranty or Fidelity defendants to disclose to plaintiffs' predecessors in interest the existence of unrecorded loans encumbering the property. For these reasons, the court finds that the Guaranty and Fidelity Defendants owed no duty to disclose to plaintiffs the existence of prior unrecorded encumbrances upon the property.

III. Plaintiffs may not maintain the claim of fraud against the Guaranty Defendants.

The amended complaint asserts that plaintiffs' predecessors were fraudulently "induced to make a preferred equity investment of $3 million" in Manzanita Holdings as a result of Guaranty's failure to disclose the existence of prior unrecorded loans which encumbered the property.[28] In Pennsylvania,

> Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture....

> To demonstrate fraud, the plaintiff must establish the following elements:

> (1) a representation;

> (2) which is material to the transaction at hand;

> (3) made falsely, with knowledge of its falsity or

---

27. *Id.*
28. Amended complaint, ¶ 9.

recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and

(6) the resulting injury was proximately caused by the reliance....

Finally,

> One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, *but only if, he is under a duty* to the other to exercise reasonable care to disclose the matter in question.[29]

In this case, the duties owed by the Guaranty defendants to plaintiffs' predecessors were those contained in the Closing Escrow Agreement. Nothing in that document required the Guaranty defendants to disclose the existence of prior unrecorded obligations encumbering the property; thus, in the absence of any duty to disclose such a matter, the Guaranty defendants may not be held liable to plaintiffs

---

29. *Youndt v. First Nat. Bank of Port Allegany*, 2005 Pa. Super. 42, 868 A.2d 539, 550 (Pa. Super. 2005)(citing Restatement (Second) of Torts, § 521)(emphasis supplied). The laws are substantially the same in Nevada and Illinois. In Nevada, ["t]he elements of intentional misrepresentation are a false representation made with knowledge or belief that it is false or without a sufficient basis of information, intent to induce reliance, and damage resulting from the reliance. *Collins v. Burns*, 103 Nev. 394, 397, 741 P.2d 819, 821 (1987). In Illinois, "the elements of a cause of action for fraudulent misrepresentation (sometimes referred to as 'fraud and deceit or 'deceit') are: (1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Soules v. Gen. Motors Corp.*, 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601 (1980).

under the claim of fraud, and that claim, asserted in Count I of the amended complaint, is dismissed.

IV. Plaintiffs may not maintain the claim of negligent misrepresentation against the Guaranty Defendants.

In Pennsylvania,

Negligent misrepresentation requires proof of:

(1) a misrepresentation of a material fact;

(2) made under circumstances in which the misrepresenter ought to have known its falsity;

(3) with an intent to induce another to act on it; and;

(4) which results in injury to a party acting in justifiable reliance on the misrepresentation.[30]

---

30. *Eortz v. Noon*, 556 Pa. 489, 500, 729 A.2d 555, 561 (1999). The law is substantially the same in Nevada and Illinois. Nevada defines the tort of negligent misrepresentation as follows: "[o]ne who, in the course of his business, profession or employment, or in any other action in which he or she has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he or she fails to exercise reasonable care or competence in obtaining or communicating the information. *Chamani v. Mackay*, 124 Nev. 1457, 238 P.3d 800 (2008). In addition, "[a] claim for negligence in Nevada requires that the plaintiff satisfy four elements: (1) an existing duty of care, (2) breach, (3) legal causation, and (4) damages." *Turner v. Mandalay Sports Entm't, LLC*, 124 Nev. 213, 217, 180 P.3d 1172, 1175 (2008). In Illinois, "[n]egligent misrepresentation has essentially the same elements [as intentional misrepresentation], except that the defendant's mental state is different. The defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action. *Bd. of Educ. of City of Chicago v. A. C&S. Inc.*, 131 Ill. 2d 428, 452, 546 N.E.2d 580,591 (1989). In addition, "Illinois recognizes that an action for negligent misrepresentation is maintainable if the complaint alleges the necessary elements of an action for negligence. These elements are a duty owed by defendants to plaintiffs, a breach of such duty, and injury resulting proximately from such breach. *Duhl v. Nash Realty Inc.*, 102 Ill. App. 3d 483, 493, 429 N.E.2d 1267, 1275 (1981).

Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another.[31]

In this case, plaintiffs have failed to show an element of negligent misrepresentation —namely, the existence of any duty beyond the ministerial duties imposed upon the Guaranty defendants under the terms of the Closing Escrow Agreement. Since plaintiffs cannot show any duty owed by the Guaranty defendants, the claim of negligent misrepresentation may not be maintained against the Guaranty defendants, and that claim, asserted in Count II of the amended complaint, is dismissed in its entirety.

V. Plaintiffs may not maintain the claim of civil conspiracy.

In Pennsylvania, a "civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose."[32] In this case, there is no evidence that any defendants combined to do an unlawful or criminal act, whether by lawful or unlawful means, or that they combined for any unlawful purpose. Plaintiffs cannot prove the existence of any "combination of two

---

31. *Milliken v. Jacono*, 2012 Pa, Super. 284, 60 A.3d 133, 141 (Pa. Super. 2012) *aff'd*, 96 A.3d 997 (Pa. 2014), withdrawn from bound volume (Oct. 15, 2014) and *appeal granted in part*, 620 Pa, 601, 71 A.3d 250 (2013).

32. *Baker v. Rangos*, 229 Pa. Super. 333, 351, 324 A.2d 498, 506 (1974). The law is substantially the same in Nevada and Illinois. In Nevada, an actionable civil conspiracy "consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Consol. Generator-Nevada, Inc. v. Cummins Engine Co.*, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (1998). In Illinois, "[t]he elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Redelmann v. Claire Sprayway, Inc.*, 375 Ill. App. 3d 912, 923, 874 N.E.2d 230, 240 (2007).

or more persons" necessary to maintain the claim of civil conspiracy and that claim, asserted in Count III of the amended complaint, is dismissed as to all defendants, including John Doe 1 and Jane Doe 2.[33]

VI. Plaintiffs may not maintain their claim asserted against defendant Fidelity in Count IV of the Amended Complaint.

Count IV of the amended complaints asserts that defendant Fidelity is liable to plaintiffs, under the theory of *respondeat superior*, as a result of the alleged wrongdoings of the Guaranty defendants while acting as agents/servants on behalf of their master, Fidelity. Plaintiffs specifically assert that Fidelity is liable as a result of the "acts and omissions" of the Guaranty defendants in connection with the issuance by such defendants of a Closing Protection Letter for the benefit of plaintiffs.[34]

Under Pennsylvania law,

Agency is the relationship which results from the manifestation of consent of one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

A master is a principal who employs an agent to perform a service in his affairs and who controls or has the right to control the physical conduct of the agent in the performance of the service.

A servant is an agent employed by a master to perform

33. The claim of civil conspiracy is dismissed also as against defendants John Doe 1 and Jane Doe 2 because at this stage of the litigation, with discovery closed, said defendants remain unidentified.

34. Closing protection letter dated June 20, 2007, Exhibit H to the amended complaint, issued by guaranty as escrow agent, document preparer, and settlement officer to the acquisition of the property by the Meusy Interests.

a service in his affairs whose physical conduct, in the performance of the service is controlled or is subject to the right to control by the master.

A master controls and may direct the manner in which work is done. He, therefore, controls more than merely the result of the work....

Because a master has the right to exercise control over the physical activities of the servant within the time of service, he is vicariously liable for the servant's negligent acts committed within the scope of his employment.[35]

This court has already determined that the Guaranty defendants are not liable to plaintiffs for any form of misrepresentation, and owed no duty whatsoever to disclose the existence of prior encumbrances upon the property. Since the Guaranty defendants as agents/servants of Fidelity are not liable to plaintiffs, it follows that Fidelity, as a master of the Guaranty defendants, may not be held liable to plaintiffs under *respondeat superior*. The claim asserted against Fidelity in Count IV of the amended complaint is dismissed.

VII. Plaintiffs may not maintain the claim of breach-of-fiduciary-duty asserted against defendants Voegel and Rothstein.

The amended complaint asserts that defendants Voegel and Rothstein, as plaintiffs' escrow agents pursuant to the Closing Escrow Agreement, owed a fiduciary duty to plaintiffs to "act with the utmost good faith in representing and carrying out plaintiffs' interests."[36] This court has already determined that the Guaranty defendants, including

35. *Turley v. Kotter*, 263 Pa. Super. 523, 529, 398 A.2d 699, 702 (1979).
36. Amended complaint, ¶ 125.

Voegel and Rothstein, owed no duty to plaintiffs under the Closing Escrow Agreement, aside from any duties set forth in the agreement itself. Nothing in that document shows that Voegel and Rothstein owed a fiduciary duty to plaintiffs, and the claim of breach-of-fiduciary-duty asserted in Count V of the amended complaint is dismissed.

VIII. Plaintiffs may not maintain the claim of malpractice asserted against Voegel and Rothstein.

The amended complaint asserts that defendants Voegel and Rothstein "were retained by plaintiffs to, *inter alia*, represent plaintiffs' interests and to serve as plaintiffs' escrow agents" pursuant to the Closing Escrow Agreement.[37] Specifically, the amended complaint avers that Voegel and Rothstein failed "to possess and exercise the ordinary skill, knowledge and care normally possessed and exercised by members of good standing in the legal profession...."[38]

To establish legal malpractice under Pennsylvania law, a plaintiff must show: 1) employment of the attorney or other basis for a duty; 2) the failure of the attorney to exercise ordinary skill and knowledge; and 3) that such negligence was the proximate cause of damage to the plaintiff.[39]

This court has already determined that the Guaranty defendants, including Voegel and Rothstein, owed no duty to plaintiffs under the Closing Escrow Agreement, aside from any duties set forth in the agreement itself. In addition, plaintiffs have offered no evidence showing that Voegel and Rothstein had been retained by plaintiffs as attorneys in conjunction with the Closing Escrow Agreement. Plaintiffs cannot prove the existence of

---

37. *Id.* ¶ 130.
38. *Id.* ¶ 148.
39. *Myers v. Robert Lewis Seigle. P.C.*, 2000 Pa. Super. 136; 751 A.2d 1182, 1184 (2000).

any duty owed by Voegel and Rothstein, and the claim of malpractice, asserted in Count VI of the amended complaint, is dismissed.

The court shall issue a simultaneous order consistent with this memorandum opinion.

## ORDER

And now, this 6th day of November, 2014, upon consideration of:

A) the motion for summary judgment of plaintiffs LEM 2Q, LLC et al. against defendants Guaranty National Title Company, Robert J. Voegel, Robert Rothstein and Joseph P. Cacciatore, the answer in opposition of defendants Guaranty National Title Company, Robert J. Voegel and Robert Rothstein, the answer in opposition of defendant Joseph P. Cacciatore, the parties' memoranda of law, and plaintiffs' reply memorandum, it is ordered that the motion is denied;

B) the motion for summary judgment of plaintiffs LEM 2Q, LLC et al., the answer in opposition of defendant Fidelity National Title Insurance Company, and the parties' respective reply and sur-reply, it is ordered that the motion is denied;

C) the motion for summary judgment of defendants Guaranty National Title Company, Robert J. Voegel Robert Rothstein and Joseph P. Cacciatore, the answer in opposition of plaintiffs and the respective memoranda of law, it is ordered that the motion is granted in its entirety and all claims asserted against these defendants in the amended complaint are dismissed;

D) the motion for summary judgment of defendant Fidelity National Title Insurance Company, the answer in opposition of plaintiff LEM 2Q, LLC, and the respective

memoranda of law, it is ordered that the motion is granted in its entirety and all claims asserted against this defendant in the amended complaint are dismissed;

E) the motion for summary judgment of defendant Joseph P. Cacciatore, the answer in opposition of plaintiff LEM 2Q, LLC, and the respective memoranda of law, it is ordered that the motion is granted and all claims asserted against this defendant in the amended complaint are dismissed.

It is further ordered as follows:

F) the claim of civil conspiracy is dismissed as to defendants John Doe 1 and Jane Doe 2 because such defendants, at the close of discovery, remain unidentified.

G) The filing by defendant Joseph P. Cacciatore, improperly captioned "motion for summary judgment" under control no. 14060967, is dismissed as moot.[40]

---

40. *See* footnote 1 to the court's memorandum opinion filed simultaneously with this order.