J-E01003-16

2016 PA Super 169

| | |
|---|---|
| LEM 2Q, LLC, LEM 2P, LLC, LEM REAL ESTATE MEZZANINE FUND, II, LP, LEM REAL ESTATE MEZZANINE PARALLEL FUND II, LP, LEM 2Q NEVADA, LLC, LEM PARTNERS, II, LP, LEM 2P NEVADA LLC, LEM PARTNERS II, LP | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| GUARANTY NATIONAL TITLE COMPANY, FIDELITY NATIONAL TITLE INSURANCE COMPANY, ROBERT J. VOEGEL, ROBERT ROTHSTEIN AND JOSEPH P. CACCIATORE | |
| Appellees | No. 3472 EDA 2014 |

Appeal from the Order Entered November 6, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 001398 July Term, 2010

BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, J., SHOGAN, J.,
LAZARUS, J., MUNDY, J., OLSON, J., OTT, J., and STABILE, J.

OPINION BY LAZARUS, J.:                                     **FILED JULY 28, 2016**

LEM2Q, LLC, LEM 2P, LLC, LEM Real Estate Mezzanine Fund, II, LP, LEM Real Estate Mezzanine Parallel Fund II, LP, LEM 2Q Nevada, LLC, LEM Partners, II LP, and LEM 2P Nevada LLC (collectively "LEM") appeal from the order entered in the Court of Common Pleas of Philadelphia County granting summary judgment in favor of Guaranty National Title Company, Robert J. Voegel, Robert Rothstein, and Joseph P. Cacciatore (collectively "Guaranty

Appellees") and Fidelity National Title Insurance Company ("Fidelity"). After careful review, we affirm.

LEM is the successor-in-interest of an entity that invested $3 million in a company holding real property in Reno, Nevada, under a preferred equity scheme. At all times relevant to this matter, Fidelity was a title insurance company registered to conduct business in Pennsylvania. Guaranty Appellees were based in Illinois and had the following roles. Guaranty National Title Company ("Guaranty") was a title assurance agent on behalf of Fidelity, as indicated in an Issuing Agent Agreement (the "IAA") between the parties.[1] Robert J. Voegel executed the IAA in his role as president of Guaranty. Robert R. Rothstein, Esquire, was a senior vice president of Guaranty. Joseph P. Cacciatore and Voegel were members of an entity known as C&V Investments, LLC ("C&V"), a non-party to the instant action.

In the Spring of 2007, C&V loaned funds to Russell M. Meusy, II, a real estate investor, and his companies (collectively, the "Meusy Interests"). The funds were used to facilitate Meusy's purchase of a 234-unit property (the "Property"), located in Reno, Nevada. The loan transactions occurred in Illinois; none of the loans was recorded with any public agency. Closing on

---

[1] Fidelity and Guaranty entered into the IAA on May 1, 1999. The IAA remained in effect at all times relevant to this action. Pursuant to the IAA, Fidelity specifically appointed Guaranty to act as a title assurance agent in a particular geographical area, which did not include Reno, Nevada.

the Property occurred on May 11, 2007. Guaranty performed the duties of settlement agent. The closing papers prepared by Guaranty did not disclose that C&V had loaned funds to the Meusy Interests.

After closing on the Property, the Meusy Interests approached LEM to obtain additional funding. LEM reviewed the settlement papers prepared by Guaranty at the Property closing of May 11, 2007, and decided to provide funding to the Meusy Interests through a mezzanine loan. On June 29, 2007, LEM invested $3 million in a company known as Manzanita Gate Apartments Holdings, LLC ("Manzanita Holdings"), an entity formed by Meusy to act as the indirect owner of the Property.[2] LEM's $3 million investment in Manzanita Holdings provided the Meusy Interests with capital and allowed LEM to acquire a preferred equity stake in Manzanita Holdings. Pursuant to a closing escrow agreement, Guaranty performed the duties of escrow agent and closing officer to the $3 million mezzanine loan.[3] During the closing, Guaranty did not disclose the existence of C&V's prior unrecorded loans to the Meusy Interests. Shortly thereafter, the Meusy

_____

[2] At the time of the relevant transactions, Manzanita Gate Apartments Holdings, LLC, had an indirect ownership interest in the Property, and Manzanita Gate Investments, LLC, was the owner of the Property.

[3] As part of its duties, Guaranty was tasked with providing a date-down endorsement to extend the coverage date of the title insurance policy issued by Ticor Title Insurance Company ("Ticor") to Manzanita Gate Investments, LLC, until June 29, 2007. Among other things, the date-down endorsement involved disclosing recorded encumbrances on the property.

Interests defaulted on all their obligations, including payments on the C&V loans and the mezzanine loan provided by LEM.

LEM commenced the instant action in July 2007. After a long and convoluted procedural history, which included the filing of an amended complaint in January of 2011,[4] LEM filed a motion for summary judgment against Guaranty, Voegel, Rothstein and Cacciatore. This motion asserted that Guaranty, as the escrow agent to the mezzanine loan transaction, had a duty to disclose to LEM the existence of the unrecorded C&V loans to the Meusy Interests. LEM asserted that if it had been informed of the existence of the C&V loans, which it characterizes as "usurious," it would have deemed an investment in Manzanita Holdings too risky to pursue. Thus, LEM argued that it would not have agreed to fund Manzanita Holdings and would not have suffered the loss of its investment.

LEM also filed a motion for summary judgment against Fidelity, as principal of Guaranty. LEM argued that Fidelity is liable for LEM's losses

_____

[4] After the amended complaint was filed, Appellees filed preliminary objections on *forum non conveniens* grounds. The trial court sustained the preliminary objections without prejudice so that the claims could be brought in either Illinois or Nevada. On appeal, this Court vacated and remanded the matter, indicating that the appropriate procedure to transfer the matter to another jurisdiction would be to file a petition pursuant to Pa.R.Civ.P. 1006(d). **See LEM 2Q, LLC v. Guar. Nat. Titile [sic] Co.**, 60 A.3d 856 (Pa. Super. 2012) (unpublished memorandum). Thereafter, Appellees filed petitions seeking dismissal of the amended complaint, again on *forum non conveniens* grounds. However, the trial court found that sufficient contacts existed with Philadelphia and denied the petitions. **See** Trial Court Order, 6/28/13; **see also** Trial Court Order, 8/9/13.

under a theory of *respondeat superior*, based upon the terms of the IAA between Fidelity and Guaranty.

On July 21, 2014, Guaranty, Voegel, and Rothstein filed a cross-motion for summary judgment against LEM. On the same day, Fidelity and Cacciatore also filed respective cross-motions for summary judgment.

The trial court denied LEM's summary judgment motion and granted each of Appellees' summary judgment motions in an order and memorandum dated November 6, 2014. LEM filed a timely notice of appeal, raising the following issue:

> Did [Guaranty Appellees], the title agent for the June 29, 2007 transaction between [LEM] and other entities for the purchase of a $3 million ownership interest in a business entity owning a property known as "Manzanita Gate," have a duty to disclose to [LEM] *inter alia* the fact that [Appellees] "stood on both sides" of the "Manzanita Gate" transaction, and the existence of over $6 million in unrecorded mortgages on the Manzanita Gate property, under settled Pennsylvania tort law setting forth a duty to disclose and precluding intentional concealment of those facts, such that both [Guaranty Appellees] and their principal Fidelity are now liable for their fraud in inducing [LEM] to consummate the Manzanita Gate transaction?

En Banc Brief of Appellants, at 2-3.

We begin by noting our standard and scope of review of an order granting summary judgment:

> Our scope of review is plenary, and our standard of review is the same as that applied by the trial court. Our Supreme Court has stated the applicable standard of review as follows: An appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a

matter of law. In making this assessment, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is *de novo*.

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a prima facie cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

*Reinoso v. Heritage Warminster SPE LLC*, 108 A.3d 80, 84 (Pa. Super. 2015) (brackets omitted).

LEM's core assertion on appeal is that Guaranty had a duty to disclose the unrecorded C&V loans to the Meusy Interests. Whether a duty exists is a question of law, and the determination of "whether there has been a neglect of such duty is generally for the jury." *Emerich v. Philadelphia Ctr. for Human Dev., Inc.*, 720 A.2d 1032, 1044 (Pa. 1998).[5] Where no affirmative duty of disclosure is owed, "mere silence does not constitute fraud." *Sewak v. Lockhart*, 699 A.2d 755, 759 (Pa. Super. 1997) (citing

---

[5] We note that the trial court completed a choice of law analysis, and finding that the outcome would not be affected regardless of which state's law was applied, determined that Pennsylvania law governs. *See* Trial Court Opinion, 11/6/14, at 5-9. This choice of law determination was not raised as an issue on appeal by any of the parties. Where "choice of law is not an issue properly presented for our consideration, we cannot discuss this issue *sua sponte*." *Discount Drug Corp. v. Honeywell Protection Services, Div. of Honeywell, Inc.*, 450 A.2d 49, 50 (Pa. Super. 1982). Thus, Pennsylvania law is utilized in our analysis.

***Wilson v. Donegal Mut. Ins. Co.***, 598 A.2d 1310, 1316 (Pa. Super. 1991)).

Instantly, the trial court determined that the parties' closing escrow agreement provides that Guaranty's duties under the agreement are purely administrative and no additional obligations are implied by the terms of the agreement. The trial court further determined that nothing within the agreement could be construed to affirmatively require Appellees to disclose unrecorded loans encumbering Manzanita Gate. Thus, the trial court concluded that Guaranty had no contractual duty to disclose the unrecorded C&V loans to LEM. The trial court also determined that no duty of disclosure arose in tort under the circumstances. We agree.

As an initial matter, we note that LEM refers to Guaranty as a title agent providing LEM with "title insurance protection" in relation to the June 29, 2007 loan transaction in which LEM invested in Manzanita Holdings. ***See*** En Banc Brief of Appellants, at 10. However, the record reveals that Guaranty played no role as a title agent in the Manzanita Holdings mezzanine loan transaction. Rather, Guaranty's role was limited to performing escrow duties as provided in the closing escrow agreement.

Significantly, LEM has assumed that the owner's title insurance policy provided LEM with title insurance coverage. Manzanita Gate Investments, LLC, was the owner of the property during the relevant time period and was

the entity to which Ticor issued the title insurance policy.[6] No evidence has been presented to demonstrate that either Manzanita Gate Apartments Holdings, LLC, the entity in which LEM invested, or LEM itself, had been named as an insured or third-party beneficiary under the policy. *See Hicks v. Saboe*, 555 A.2d 1241, 1243 (Pa. 1989) ("the duty of a title insurance company runs only to its insured, not to third parties who are not party to the contract"). LEM also admits that it was not specifically insured as a preferred equity investor.[7] *See* Transcript of Jay J. Eisner Deposition,

_____

[6] Although the title insurance policy was underwritten by Ticor rather than Fidelity, LEM attempts to assign liability to Fidelity based upon a Closing Protection Letter ("CPL") that was apparently erroneously issued by an unknown individual at Guaranty. Regardless of the reason the CPL was issued, the language on the face of the CPL indicates that it does not extend coverage to LEM under the circumstances. The CPL indicates that it applies "[w]hen the insurance of [Fidelity] is specified for [the party's] protection" where the party is "the lessor or purchaser of an interest in land or a lender secured by a mortgage [or other security interest.]" *See* Closing Protection Letter. Here, no insurance policy was underwritten by Fidelity, Guaranty was not authorized by Fidelity to act as a title agent in Reno, Nevada, and LEM did not obtain a direct interest in the property. Additionally, we note that courts that have considered similar scenarios have determined that "the issuance of a title insurance policy is generally necessary for liability to ensue under a closing protection letter." *National Mortgage Warehouse, LLC v. Bankers First Mortgage Co.*, 190 F. Supp. 2d 774, 783 (D. Md. 2002) (citing *Fleet Mortgage Co. v. Lynts*, 885 F. Supp. 1187 (E.D. Wis. 1995)).

[7] Endorsements for mezzanine lenders and preferred equity investors exist and were available at the time of the transactions in this matter, but none was obtained by LEM. Such endorsements are added to an owner's policy, such as the policy Manzanita Gate Investments, LLC, obtained in this matter. The endorsements are intended to prevent imputation of the policy-holding member's knowledge to the lender or investor, since encumbrances that the
*(Footnote Continued Next Page)*

11/12/13, at 52-54. Thus, LEM was not entitled to "title insurance protection" under the policy, even if Guaranty were acting as a title agent in the relevant transaction.

Guaranty, as escrow agent, was merely responsible for performing administrative duties in the transaction in which LEM invested in Manzanita Gate Holdings. Indeed, "[the escrow agent] under an escrow agreement is generally considered to be an agent (or trustee) for both parties – a special agency whose authority must be strictly construed, and who is bound by the terms of the escrow agreement." *Janson v. Cozen & O'Connor*, 676 A.2d 242, 247 (Pa. Super. 1996) (citation omitted).

Here, the closing escrow agreement states that Guaranty's duties as escrow agent "are only as herein specifically provided, and are purely ministerial in nature. . . . This agreement sets forth all the obligations of [Guaranty] with respect to any and all matters pertinent to the escrow contemplated hereunder and no additional obligations of [Guaranty] shall be implied." Closing Escrow Agreement, at 5-6. Moreover, the date-down

_(Footnote Continued)_ ―――――――――

policy-holder has either agreed to or has knowledge of are exempted from coverage under the typical title insurance policy. **See** John C. Murray, **Title Insurance for Mezzanine Financing Transactions** (American Law Institute Continuing Legal Education 2005). Imputation presents a risk to the investor because, at least under Pennsylvania law, an LLC's member's knowledge is imputed to other members. **See Moskowitz v. A.B. Kirschbaum Co.**, 89 Pa. Super. 274, 276 (1926); 15 Pa.C.S. § 8324; 15 Pa.C.S. § 8904.

endorsement which Guaranty was obligated to provide under the escrow agreement <u>indicates that only items of record were to be disclosed</u>. Thus, Guaranty complied with respect to the plain meaning of the escrow agreement regarding required disclosure. Pursuant to the closing escrow agreement, Guaranty did not and could not owe any other duties to LEM.[8]

LEM also asserts that the Guaranty Appellees had a duty arising in tort to disclose the existence of the C&V loans. This argument is presented as a

_____

[8] LEM has argued that a Nevada case, ***Mark Properties, Inc. v. Nat'l Title Co.***, 34 P.3d 587 (Nev. 2001), required Guaranty to disclose the unrecorded C&V loans. The holding of ***Mark Properties*** requires an escrow agent to disclose in instances where evidence of substantial fraud exists; it is a narrow exception to Nevada's general rule that an escrow agent's duties are limited to the instructions contained in the escrow agreement. The facts involved an escrow agent who allegedly knew of a double escrow in which two business parties breached their fiduciary duties to two other business partners. A double escrow has been defined as follows:

> the broker or salesman purchases a principal's property in the first escrow, and sells it to a third party at a profit in a second escrow without a full disclosure to both the principal and the third party. The escrows close at the same time and the broker or salesman thereby uses the proceeds from the sale in the second escrow to purchase his principal's property. The broker or salesman receives a commission on the sale in the first escrow and a secret profit on the closing in the second escrow.

***Alley v. Nevada Real Estate Div.***, 575 P.2d 1334, 1335 (Nev. 1978). Because the facts of ***Mark Properties*** involved a known breach of fiduciary duty between business partners, it is factually inapposite to the instant matter, which involves two separate closings between multiple different entities. Since Nevada law generally limits the duties of an escrow agent to those specified in the escrow agreement, it is equivalent to Pennsylvania law as applicable to the instant matter.

fraudulent inducement claim based upon duties outlined in the Restatement

(First) of Torts § 529[9] and Restatement (Second) of Torts §§ 550,[10] 551.[11]

_____

[9] Section 529, Representation Misleading Because Incomplete, was adopted into Pennsylvania jurisprudence in **Neuman v. Corn Exch. Nat. Bank & Trust Co.**, 51 A.2d 759 (Pa. 1947). Section 529 provides that "[a] statement in a business transaction which, while stating the truth so far as it goes, the maker knows or believes to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation." Rest. 1st Torts § 529.

[10] Section 550, Liability for Fraudulent Concealment, provides that "[o]ne party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." Rest. 2d Torts § 550.

[11] Section 551, Liability for Nondisclosure, provides:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

> > (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

> > (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

*(Footnote Continued Next Page)*

The specific elements of fraud include the following:

(1) a representation;

(2) which is material to the transaction at hand;

(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;

(4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and

(6) the resulting injury was proximately caused by the reliance.

*Youndt v. First Nat. Bank of Port Allegany*, 868 A.2d 539, 545 (Pa. Super. 2005) (discussing fraud claims premised on Rest. 2d Torts §§ 550, 551). More specifically, a fraudulent inducement claim asserts that "representations were fraudulently made and that 'but for them' [the party] would never have entered into the agreement." *Id.* at 546 (quoting *Blumenstock v. Gibson*, 811 A.2d 1029, 1036 (Pa. Super. 2002)).

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>
> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Rest. 2d Torts § 551.

We note that in a transaction involving an escrow, two separate contracts are consummated. First, the parties agree to the terms of the underlying contract. Thereafter, *because* they have agreed to the underlying contract, they enter into a separate agreement with the escrow agent. Indeed, the escrow agreement is "entirely separate" from the underlying contract. **Umani v. Reber**, 155 A.2d 634, 637 (Pa. Super. 1959) (quoting **Angelcyk v. Angelcyk**, 380 A.2d 753, 756 (Pa. 1951)).

Instantly, the record is devoid of evidence of any representation by Appellees to LEM other than information provided by Guaranty to fulfill its duties as escrow agent for the mezzanine loan transaction. Thus, LEM's decision to invest $3 million in mezzanine loan funds in the Meusy Interests, which constitutes the "underlying contract" in this matter, was made independently from Guaranty and the other Appellees. It is only logical that Appellees would not have made representations to LEM regarding the mezzanine loan transaction since none of the Appellees was a party to that transaction. Indeed, LEM's amended complaint supports the conclusion that the Meusy Interests were responsible for LEM's agreement to the mezzanine loan terms.[12] **See** Amended Complaint, 1/14/11, at ¶ 51 (stating Meusy

_____

[12] Because no facts of record indicate that Guaranty or any of the other Appellees had any role in actually securing LEM's investment, the fraud in the inducement claim necessarily implicates an individual or entity within the Meusy Interests as the party having a duty to disclose unrecorded encumbrances to LEM. Significantly, neither Meusy nor any of the Meusy Interests is a party to this action. We note that LEM included a claim of
*(Footnote Continued Next Page)*

Interests "approached [LEM] to make a preferred equity investment in Manzanita Gate"). Moreover, because LEM agreed to the underlying contract without Appellees' input, it cannot be said that LEM would not have done so "but for" representations or omissions made by the Guaranty Appellees. *Blumenstock*, *supra*.

Additionally, none of the Restatement tort duties that LEM relies upon could have been triggered with regard to the mezzanine loan transaction since Guaranty was not a party to the transaction. Indeed, the Restatement duties to disclose or provide complete information under Sections 529, 550, and 551 apply only in the context of a *business transaction between the parties*. *See* nn. 9-11, *supra*. Here, Guaranty was a party only to the escrow and thus had no duties toward LEM in the mezzanine loan transaction. In the separate escrow agreement contract, to which Guaranty was a party, the agreement itself conclusively sets forth Guaranty's duties and must be strictly construed.[13] *See* Closing Escrow Agreement, at 6 ("This Agreement sets forth all the obligations of Escrow Agent with respect

_____
*(Footnote Continued)*

conspiracy involving Appellees and the Meusy Interests in the amended complaint but has abandoned that argument on appeal.

[13] Additionally, LEM has not addressed the fact that piercing the veil would be required in order to require Guaranty to disclose the unrecorded loans of a separate entity, C&V. LEM merely has stated that Voegel was the principal of Guaranty and a partner in C&V. While this fact demonstrates a connection between the entities, LEM has provided no argument, legal analysis, or evidence to show that the veil should be pierced.

to any and all matters pertinent to the escrow contemplated hereunder and no additional obligations of Escrow Agent shall be implied from the terms of this Agreement or any other Agreement."); ***Janson***, ***supra***. Moreover, LEM has admitted that Guaranty performed its duties in relation to the escrow agreement. ***See*** Transcript of Jon S. Robins, Esquire, Deposition, 1/29/14, at 81 (closing instructions from LEM's counsel with respect to escrow agreement were followed).

Finally, we note that the claims against Fidelity in this matter are predicated solely on the agency relationship between Fidelity and Guaranty, as set forth in the IAA. No independent basis for liability on Fidelity's part exists. Instantly, because neither Guaranty nor any of the other Guaranty Appellees has breached any duties to LEM, Fidelity cannot be liable as a matter of law.

For the foregoing reasons, we find that the material facts, which are not disputed, demonstrate that Appellees had no duty to disclose the C&V loans under either contract or tort law. Thus, Appellees' silence does not constitute fraud. ***Sewak***, *supra*. Because Appellees owed no duty to LEM as a matter of law, the trial court properly entered summary judgment in favor of Appellees.

Order affirmed.

This decision was reached prior to July 25, 2016, with Judge Mundy's participation.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/28/2016